IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>v.<br><br>BOBBY J. McCAW,<br>    Defendant. | Case No. 4:15CR40040-001-JES-JEH |

### Report and Recommendation

A grand jury charged the Defendant, Bobby J. McCaw (McCaw), with being a felon in possession of a firearm pursuant to 18 USC § 922(g)(1) and 18 USC § 924(a)(2). (D. 1). Thereafter, McCaw filed a Motion to Suppress Evidence, which is now before the Court. (D. 7). Chief Judge James E. Shadid referred the motion to the undersigned for a Report and Recommendation. This Court conducted an evidentiary hearing on October 14, 2015, and the matter is now ripe for a ruling. For the reasons set forth below, the Court recommends that the motion be DENIED.

I

On the evening of June 12, 2015 into the early morning hours of June 13, 2015, an outdoor festival was ongoing in downtown Rock Island, Illinois. Officer Justin Holmes (Officer Holmes) of the Rock Island City Police Department was on patrol that evening as part of the Downtown Police Unit, which handled all of the bars in the downtown district. Around 1:40 a.m. on June 13th, Officer Holmes stood at the intersection of 18th Street and 2nd Avenue with six or seven other officers when an employee of the Daiquiri Factory (bar), a bar in the district, approached the group of officers and asked for Officer Holmes by name.

The employee told Officer Holmes that Kyle Peters, the owner of the Daiquiri Factory, sent him to look for Officer Holmes, in addition to Peters having sent the officer a text message. Officer Holmes testified that Peters wanted the officer to meet him inside the bar because "there was a subject inside the Daiquiri Factory that had a handgun," although Officer Holmes's police report noted that he was told that someone in the bar "could possibly have a gun on his person."

In response to this request, Officer Holmes, along with the other officers, headed to the bar. When they arrived, some of the officers stood at the bar's various exits to prevent anyone from leaving, while Office Holmes went inside. Officer Holmes went into the bar through its south entrance and proceeded through the bar to the north, back end of the bar where Peters was, Officer Holmes knowing Peters by sight. The bar's surveillance video shows Officer Holmes passing McCaw as he headed to the back of the bar. A few seconds later, two other officers entered the bar and also headed to the back where Officer Holmes and Peters were.

According to Officer Holmes's testimony, Peters told Officer Holmes that two individuals had told him that a white man "wearing a black basketball cap and a gray shirt had a handgun in his waistband." Peters then pointed to the man, who was about fifteen feet from where they were standing, that man being McCaw.

Officer Holmes then headed toward McCaw, who faced him as he approached. However, as Officer Holmes approached, McCaw turned toward the bar, similar to what he would do if he were to order a drink. Officer Holmes then came up behind McCaw and placed his hands on both sides of McCaw's hips from behind, for the purposes of getting McCaw's attention and to see if he had a handgun in his waistband.

Officer Holmes testified that when he placed his hands on McCaw's hips, McCaw then went toward the front of his waistband with his right hand, which caused Officer Holmes to believe that McCaw in fact had a firearm in the front of his waistband. Officer Holmes then immediately put his hand in the front of McCaw's waist with his right hand, at which point he felt the handgun and removed McCaw's hand from the top of it. A milieu then ensued in which, with the assistance of other officers, McCaw was taken to the ground and Officer Holmes removed the firearm from McCaw's waistband, all of which was captured on the surveillance video.

That video, of relatively poor quality, clearly shows that McCaw had a bottle in his hand at some point before Officer Holmes approached. One cannot tell from the video, however, whether McCaw had the bottle in his hand when Officer Holmes put his hands upon McCaw or if McCaw had set the bottle on the bar. Likewise, the video does not reveal if McCaw did or did not reach for the front of his waistband when touched by Officer Holmes. During the takedown of McCaw, the video does reveal a woman, who appeared to be with McCaw, pick what looks to be a beer bottle off the floor, but the video does not reveal whether that bottle was the bottle previously held by McCaw.

## II

McCaw argues that the firearm taken from him must be suppressed as the fruit of an unlawful search because Officer Holmes lacked reasonable suspicion to stop and frisk him. (D. 7). Specifically, he argues that the information given to Officer Holmes by Kyle Peters lacked sufficient indicia of reliability to create reasonable suspicion. In order for that information to have the requisite level of reliability, he argues that Officer Holmes needed to know "how the two customers knew that Defendant was carrying a concealed handgun." (D. 7 at ECF pp 3-40).

The government responds that, first, Officer Holmes' placement of his hands on McCaw's hips was not a Fourth Amendment seizure; the placement of his hands on McCaw's hips was an appropriate method of getting his attention, similar to tapping him on the shoulder. Secondly, even if Officer Holmes actions constituted a seizure, he had reasonable suspicion to believe McCaw possessed a firearm. Specifically, Peters identified a crime in progress (possessing a concealed firearm in a bar in violation of 430 ILCS 66/65(a)(9)) which requires a lesser degree of probability with fewer procedural checks in advance to be reasonable. Second, the information provided by Peters to Officer Holmes had sufficient indicia of reliability, especially given the fact that the "tip" was not anonymous.

In light of these arguments, the initial question before the Court is whether Officer Holmes had reasonable suspicion to stop and frisk McCaw for a firearm. If the answer to this question is "yes," then the inquiry is at an end and the motion to suppress evidence must be denied. Only if Officer Holmes lacked reasonable suspicion does it then become necessary to determine whether the placing of Officer Holmes's hands on McCaw's hips constituted a Fourth Amendment seizure. Because, as set forth below, the Court concludes that Officer Holmes had reasonable suspicion to stop and frisk McCaw, the Court does not reach the second question.

### III
### A

The Fourth Amendment protects against unreasonable searches and seizures. See for example, *United States v Grogg,* 534 F3d 807, 810 (7th Cir 2008). Police are permitted, however, to make investigatory stops limited in scope and executed through the least restrictive means reasonable, referred to as *Terry* stops. See *Terry v Ohio,* 392 US 1 (1968); *United States v Swift,* 220 F3d 502, 506 (7th

Cir 2000). *Terry* stops are permissible so long as they are supported by reasonable and articulable suspicion that the suspect has committed a crime or is about to do so. *United States v LePage,* 477 F3d 485, 487 (7th Cir 2007); *United States v Lawshea,* 461 F3d 857, 859 (7th Cir 2006). Thus, "a stop supported by articulable suspicion is 'reasonable' under the fourth amendment." *United States v Wooden*, 551 F3d 647, 649 (7th Cir 2008), citing *Terry v Ohio,* 392 US 1 (1968); *Illinois v Wardlow*, 528 US 119 (2000); *United States v Chaidez*, 919 F2d 1193 (7th Cir 1990). In evaluating the reasonableness of a *Terry* stop, the Court examines the "totality of the circumstances known to the officer at the time of the stop," with "reasonable suspicion being less than probable cause but more than a hunch." *Grogg*, 534 F3d at 810, citing *United States v Fiasche,* 520 F3d 694, 697 (7th Cir 2008); *Lawshea*, 461 F3d at 859.

**B**

In the case at Bar, in light of the totality of the circumstances, Officer Holmes had reasonable suspicion to perform a pat down of McCaw.

First, the information precipitating the pat down came from an identified, known source; it did not come from an anonymous tip. As the Defendant notes, anonymous tips alone seldom demonstrate an informant's basis of knowledge or veracity, *Flordia v JL*, 529 US 266 (2000), although even such anonymous tips can sometimes establish reasonable suspicion where the tip, "suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" Id at 271, quoting *Alabama v White,* 496 US 325, 329 (1990). But the cases addressing anonymous tips are inapposite here; the information leading to the pat down of McCall came from Kyle Peters, the owner of the Daiquiri Factory. Kyle Peters was previously known to Officer Holmes, Peters knowing him well enough to have his personal cell phone number with

which he texted Officer Holmes in an effort to get him to the bar on the night in question.

In a typical anonymous tip case, "officers cannot assess the credibility of the source and have no way to hold the source responsible if the information turns out to be fabricated," *United States v Robinson*, 537 F3d 798, 802 (7th Cir 2008), citing *JL*, 529 US at 271-72, which "makes the tips less reliable and generally not sufficient to create reasonable suspicion." Id.  Here, however, Officer Holmes knew Kyle Peters, could assess his credibility, and knew where to find him if the information he provided to him turned out to be false.  See id. The fact the Peters was willing to convey the information, in person, to Officer Holmes suggests that he found the information to be credible and worthy of police attention. See *Robinson*, 537 F3d at 802 (noting that non-anonymous sources relaying second-hand information to police was "significant" in that it suggested those sources found the information to be credible and worthy of police attention).  A non-anonymous source who relays secondhand information to the police does not become anonymous by virtue of the fact that he is relaying secondhand information; the person conveying the information to the police is obviously not anonymous in this circumstance. See id.

The fact that Peters was willing to identify himself to Officer Holmes and thereby vouch for the credibility of the information he relayed is particularly significant in this case. As Officer Holmes testified, the bar owners in the district, including Peters, had his personal cell phone number to contact. Thus, Peters had an interest in conveying accurate information to Officer Holmes, as Peters obviously relied upon the response of Officer Holmes and other officers on patrol in the district to address issues at his bar. Likewise, as the owner of the Daiquiri Factory, Peters not only had an interest in the safety of his patrons, but would also have an interest in not having his customers arrested based upon

6

false tips. Thus, the risk of a fabricated tip from an anonymous source as in *JL* are not present here. *JL*, 529 US at 271.

Second, Peters's information came from two customers, both of whom said that McCaw had a handgun in his waistband. The fact that Peters's secondhand information came from two customers, rather than one, also lends to the reliability of the information relied upon by Officer Holmes. The likelihood of two customers fabricating a tip or being mistaken is much less than only one customer doing so. Of course, the fact that two customers went to Peters about the gun in the waistband is not dispositive, but it is one more fact which weighs in the totality of the circumstances in favor of a finding of reasonable suspicion.

Third, the fact that Peters's information related to the possible illegal possession of a concealed firearm in a crowded bar late at night weighs in the balance in favor of a finding of reasonable suspicion. As the government notes, it is illegal in Illinois to possess a concealed firearm in a bar. See 430 ILCS 66/65(a)(9). Peters was clearly anxious to have the issue addressed, as he not only texted Officer Holmes but also sent an employee out looking for him. Likewise, the potential of a patron illegally possessing a concealed weapon in a bar late at night presents a danger to the other patrons in the bar, which is no doubt one of the reasons why the Illinois Legislature prohibits the possession of a concealed weapon in that circumstance. Moreover, as the court in *United States v Wooden*, 551 F3d 647, 650 (7th Cir 2008), noted, "it has long been understood that, when the police believe that a crime is in progress (or imminent), action on a lesser degree of probability, or with fewer procedural checks in advance, can be reasonable." "A need for dispatch can make reasonable a stop that would not otherwise be reasonable if the police had time to investigate at leisure." Id. There certainly existed some need for dispatch in this case and, although again not dispositive, this fact "goes into the calculus of reasonableness, together with the

7

fact that *Terry* stops are brief, and people can quickly go on their way if the [information] proves to be unfounded." Id.

In sum, Officer Holmes possessed reasonable suspicion to perform a pat down of McCaw under the totality of the circumstances given that: 1) Kyle Peters personally relayed the information he received to Officer Holmes, thereby vouching for the credibility of the information he received; 2) two separate customers reported to Peters, who in turn reported to Officer Holmes, that a man fitting McCaw's description had a firearm in his waistband; 3) the allegation of illegally possessing a firearm in a crowded bar late at night concerned ongoing criminal activity presenting a risk to the patrons warranting quick action.

## C

Given the Court's finding that Officer Holmes had reasonable suspicion to frisk McCaw, the Court need not address the government's argument that the placement of Officer Holmes's hands on McCaw's hips was not a Fourth Amendment seizure. Seizure or not, the reasonable suspicion gave Officer Holmes the right to place his hands on McCaw's hips to frisk for a weapon. Likewise, it is immaterial whether McCaw did or did not reach for his waistband because, even if he had a beer bottle in his hand and did not reach for his waistband as the Defendant suggests, the reasonable suspicion Officer Holmes possessed allowed him to permissibly pat down the front of McCaw's waistband, where the firearm was discovered.

## IV

For the reasons stated above, the undersigned recommends that the Defendant's Motion to Suppress Evidence (D. 7) be DENIED. The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) working days after service of this

Report and Recommendation. FRCP 72(b)(2); 28 USC § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. Johnson v Zema Systems Corp, 170 F3d 734, 739 (7th Cir 1999); Lorentzen v Anderson Pest Control, 64 F3d 327, 330 (7th Cir 1995).

*It is so ordered.*

Entered on October 20, 2015

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE